Peter I. Ostroff (SBN 045718)
postroff@sidley.com
Sally S. Neely (SBN 075547)
sneely@sidley.com
Michelle B. Goodman (SBN 218607)
mgoodman@sidley.com
Joshua E. Anderson (SBN 211320)
janderson@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013-1010
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

Attorneys for Appellee
Daewoo Motor Company, Ltd.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>DAEWOO MOTOR AMERICA, INC.,<br><br>Reorganized Debtor. | Case No. 2:11-cv-04653-SVW<br><br>Bankr. Court Case No. 2:02-24411-BB<br><br>Chapter 11<br><br>Appeal from the United States Bankruptcy Court for the Central District of California, Sheri Bluebond, Bankruptcy Judge<br><br>**BRIEF OF APPELLEE DAEWOO MOTOR COMPANY, LTD.** |

# **TABLE OF CONTENTS**

**Page**

BASIS FOR APPELLATE JURISDICTION ................................................................. 1

ISSUES PRESENTED AND STANDARDS OF REVIEW ......................................... 1

STATEMENT OF THE CASE AND FACTS ............................................................... 3

    A.   The Plan And The Creation Of The Creditor Trust ......................................... 3

    B.   The Term Of The Creditor Trust ...................................................................... 3

    C.   DMA's First Motion To Extend The Term Of The Creditor Trust ................. 4

    D.   DWMC's $118 Million Judgment Against DMA ............................................ 4

    E.   The Status Of Cash In The Creditor Trust And Claims Against It ................. 5

    F.   The Bankruptcy Court's Denial Of DMA's Extension Motion ...................... 6

SUMMARY OF ARGUMENT ................................................................................... 8

ARGUMENT .............................................................................................................. 10

I.   The Bankruptcy Court Did Not Abuse Its Discretion In Finding That DMA's
    Motion To Extend The Term Of The Creditor Trust Was Untimely .................... 10

    A.   The Bankruptcy Court Correctly Concluded That DMA's Extension
        Motion Was Untimely Under § 2.8 Of The Creditor Trust Agreement ........ 11

    B.   DMA's Arguments Confirm That The Bankruptcy Court Did Not Abuse
        Its Discretion In Denying The Extension Motion ......................................... 13

        1.   The Plan's Reference To Revenue Procedure 94-45 Does Not Change
             The Terms Of Or Negate § 2.8 Of The Creditor Trust Agreement ........ 13

        2.   The Unsworn Statements Of Outside Counsel For DMA And The
             Trustee Do Not Change The Terms Of Or Negate § 2.8 Of The
             Creditor Trust Agreement .................................................................... 16

II.  DMA Concedes That The Bankruptcy Court Did Not Err In Refusing To
    Modify The Creditor Trust Agreement ................................................................. 19

    A.   The Relief DMA Seeks Is A Modification, Not An Interpretation ............... 19

    B.   DMA Failed To Satisfy Its Burden Of Proving A Mutual Mistake .............. 22

III. DMA's Argument That DWMC Lacks Standing To Defend The Bankruptcy
    Court's May 17 Order On Appeal Has No Merit .................................................. 24

    A.   The "Person Aggrieved" Test Does Not Apply To Appellees ..................... 24

i

B.   Even If The "Person Aggrieved" Test Applies To Appellees, DWMC Satisfies It ............................................................................................. 27

CONCLUSION ............................................................................................................. 30

**BRIEF OF APPELLEE**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.),*
   547 F.3d 763 (7th Cir. 2008) ............................................................21

*Amtower v. Photon Dynamics, Inc.,*
   158 Cal. App. 4th 1582 (2008) ........................................................13

*Anderson v. Bessemer City,*
   470 U.S. 564 (1985)........................................................................2, 3

*Appalachian Ins. Co. v. McDonnell Douglas Corp.,*
   214 Cal. App. 3d 1 (1989) .......................................15, 22, 23, 24

*Apra v. Aureguy,*
   55 Cal. 2d 827 (1961) ................................................................11, 12

*Bailard v. Marden,*
   36 Cal. 2d 703 (1951) .......................................................................23

*Bank of Maui v. Estate Analysis, Inc.,*
   904 F.2d 470 (9th Cir. 1990) ..........................................................26

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.,*
   321 B.R. 147 (D.N.J. 2005) ............................................................25

*Beal Bank v. Jack's Marine, Inc. (In re Beal Bank),*
   201 B.R. 376 (E.D. Pa. 1996) ........................................................21

*Benedor Corp. v. Conejo Enters. (In re Conejo Enters.),*
   96 F.3d 346 (9th Cir. 1996) ..............................................................2

*Brady v. Andrew (In re Commercial W. Fin. Corp.),*
   761 F.2d 1329 (9th Cir. 1985) ........................................................27

*Brinton v. Bankers Pension Servs., Inc.,*
   76 Cal. App. 4th 550 (1999) ...........................................................17

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   68 Cal. App. 4th 445 (1998) ...........................................................16

*Decker v. Tramiel (In re JTS Corp.),*
    617 F.3d 1102 (9th Cir. 2010) .............................................................. 2

*Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.),*
    177 F.3d 774 (9th Cir. 1999) ........................................................ 27, 28

*Ede v. Ede,*
    208 Cal. App. 2d 718 (1962) ............................................................ 12

*Enterprise Financial Group, Inc. v. Curtis Mathes Corp.,*
    197 B.R. 40 (E.D. Tex. 1996) ........................................ 20, 21, 24, 29

*Estate of Shapiro v. Comm'r of Internal Revenue,*
    111 F.3d 1010 (2d Cir. 1997) ........................................................... 14

*Fondiller v. Robertson (In re Fondiller),*
    707 F.2d 441 (9th Cir. 1983) ................................................ 24, 25, 27

*Founding Members of the Newport Beach Country Club v.*
    *Newport Beach Country Club, Inc.,*
    109 Cal. App. 4th 944 (2003) ............................................................ 16

*Friedman Prof'l Mgmt. Co. v. Norcal Mut. Ins. Co.,*
    120 Cal. App. 4th 17 (2004) .............................................................. 15

*Garcia v. Truck Ins. Exch.,*
    36 Cal. 3d 426 (1984) ....................................................................... 17

*Gen. Elec. Capital Corp. v. Dial Bus. Forms, Inc.(In re Dial Bus. Forms, Inc.),*
    341 F.3d 738 (8th Cir. 2003) .............................................................. 2

*Grosse v. Barman,*
    9 Cal. App. 650 (1909) ...................................................................... 12

*Headlands Reserve, LLC v. Ctr. for Natural Lands Mgmt.,*
    523 F. Supp. 2d 1113 (C.D. Cal. 2007) ....................................... 16, 17

*Heath v. Am. Express Travel Related Servs. Co. (In re Heath),*
    331 B.R. 424 (B.A.P. 9th Cir. 2005) ................................................. 26

*Hess v. Ford Motor Co.,*
    27 Cal. 4th 516 (2002) ........................................................... 22, 23, 24

**BRIEF OF APPELLEE**

*Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc.*
    *(In re Trailer Source, Inc.)*,
    555 F.3d 231 (6th Cir. 2009) ................................................................25, 28, 29

*In re Dial Bus. Forms, Inc.*,
    341 F.3d 738 (8th Cir. 2003) .............................................................................2

*In re Falcon Prods., Inc.*,
    No. 05-41108-399, 2007 Bankr. LEXIS 4655 (Bankr. E.D. Mo. Oct. 9,
    2007) ...................................................................................................................21

*In re Logan Place Props., Ltd.*,
    327 B.R. 811 (Bankr. S.D. Tex. 2005) ..............................................................24

*Inamed Corp. v. Medmarc Cas. Ins. Co.*,
    258 F. Supp. 2d 1117 (C.D. Cal. 2002).......................................................22, 24

*Int'l Ass'n of Firefighters v. City of Vallejo (In re City of Vallejo)*,
    408 B.R. 280 (B.A.P. 9th Cir. 2009) ......................................................26, 27, 28

*JCB, Inc. v. Union Planters Bank*,
    539 F.3d 862 (8th Cir. 2008) .............................................................................1

*Jordan v. Warehouse Servs., Inc.*,
    81 F. Supp. 2d 1257 (M.D. Ala. 2000)..............................................................17

*Kulhawik v. Holder*,
    571 F.3d 296 (2d Cir. 2009) ..............................................................................17

*Larsen v. Johannes*,
    7 Cal. App. 3d 491 (1970) .................................................................................18

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*,
    126 F.3d 380 (2d Cir. 1997) ..............................................................................29

*Medtronic, Inc. v. White*,
    526 F.3d 487 (9th Cir. 2008) .............................................................................14

*Monterey/Santa Cruz County Bldg. & Constr. Trades Council v.*
    *Cypress Marina Heights LP*,
    191 Cal. App. 4th 1500 (2011) ..........................................................................18

*Moran v. LTV Steel Co. (In re LTV Steel Co.)*,
    560 F.3d 449 (6th Cir. 2009) ...................................................................28, 29, 30

v

*Nat'l Ins. Underwriters v. Carter*,
   17 Cal. 3d 380 (1976) ...................................................................... 16

*Official Comm. of Unsecured Creditors v. Dow Corning Corp.*
   *(In re Dow Corning Corp.)*,
   456 F.3d 668 (6th Cir. 2006) ............................................................. 2

*People ex rel. Dep't of Parks & Recreation v. West-A-Rama, Inc.*,
   35 Cal. App. 3d 786 (1973) ....................................................... 15, 18

*Perry v. Bedford*,
   238 Cal. App. 2d 6 (1965) ............................................................... 23

*Peterson v. Minidoka County Sch. Dist. No. 331*,
   118 F.3d 1351 (9th Cir. 1997) ........................................................ 15

*ReGen Capital I, Inc. v. UAL Corp. (In re UAL Corp.)*,
   635 F.3d 312 (7th Cir. 2011) ............................................................ 1

*Renwick v. Bennett (In re Bennett)*,
   298 F.3d 1059 (9th Cir. 2002) ........................................................ 17

*Salomon v. Logan (In re Int'l Envtl. Dynamics, Inc.)*,
   718 F.2d 322 (9th Cir. 1983) .......................................................... 27

*Sass v. Hank*,
   108 Cal. App. 2d 207 (1951) .......................................................... 18

*Shaw v. Regents of the Univ. of Cal.*,
   58 Cal. App. 4th 44 (1997) ....................................................... 13, 14

*Skyline Corp. v. NLRB*,
   613 F.2d 1328 (5th Cir. 1980) ........................................................ 17

*Smith v. Miller (In re Dominguez)*,
   995 F.2d 883 (9th Cir. 1993) ............................................................ 2

*Stumpf v. McGee (In re O'Connor)*,
   258 F.3d 392 (5th Cir. 2001) ............................................................ 2

*Tapco Prods. Co. v. Van Mark Prods. Corp.*,
   446 F.2d 420 (6th Cir. 1971) .......................................................... 16

*Terex Corp. v. Metro. Life Ins. Co. (In re Terex Corp.)*,
   984 F.2d 170 (6th Cir. 1993) ..................................................... 2, 21

**BRIEF OF APPELLEE**

*United States v. Toyota of Visalia*,
  772 F. Supp. 481 (E.D. Cal. 1991), *aff'd*, 988 F.2d 126 (9th Cir. 1993) ..... 14, 15

*Winet v. Price*,
  4 Cal. App. 4th 1159 (1992) ................................................................. 18

**STATUTES AND RULES**

11 U.S.C. § 67(c) (1976) (repealed 1978) ................................................. 25

11 U.S.C. § 1109(b) ............................................................................. 24

11 U.S.C. § 1127 ............................................................................. 3, 24

11 U.S.C. § 1127(b) ........................................................... 7, 19, 20, 21

28 U.S.C. § 158(a)(1) ............................................................................ 1

28 U.S.C. § 158(c)(1)(A) ........................................................................ 1

Fed. R. Bankr. P. 8013 ........................................................................... 2

Fed. R. Civ. P. 52(c) .............................................................................. 5

Cal. Civ. Code § 1636 .......................................................................... 11

Cal. Civ. Code § 1638 .......................................................................... 11

Cal. Civ. Code § 1639 .......................................................................... 11

Cal. Civ. Code § 1641 .......................................................................... 16

Cal. Civ. Code § 3399 .......................................................................... 22

**OTHER AUTHORITIES**

*Black's Law Dictionary* 1004 (6th ed. 1990) ......................................... 20

8B C.J.S. *Bankruptcy* § 1239 (2011) ...................................................... 25

Appellee Daewoo Motor Company, Ltd. ("DWMC") respectfully submits its Brief of Appellee in this appeal where Chapter 11 Reorganized Debtor and Appellant Daewoo Motor America, Inc. ("DMA") and the Trustee of the Creditor Trust ("Trustee") challenge the bankruptcy court's order denying DMA's Motion to Extend the Term of the Creditor Trust ("Extension Motion") as unauthorized and untimely based on its interpretation of the unambiguous terms of the DMA Creditor Trust Agreement ("Creditor Trust Agreement"), which is part of DMA's confirmed Chapter 11 plan of reorganization ("Plan"). The bankruptcy court did not abuse its discretion in denying the Extension Motion as untimely under the clear terms of the Plan. It also properly refused to modify DMA's substantially consummated Plan.

## BASIS FOR APPELLATE JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 158(a)(1) and (c)(1)(A).

## ISSUES PRESENTED AND STANDARDS OF REVIEW

**1.** Whether the bankruptcy court erred in interpreting the Creditor Trust Agreement, which is part of the Plan, to require the denial of the Extension Motion as untimely? A bankruptcy court's interpretation of a plan it confirmed is reviewed for abuse of discretion. *See ReGen Capital I, Inc. v. UAL Corp. (In re UAL Corp.)*, 635 F.3d 312, 319 (7th Cir. 2011). As the Seventh Circuit explained:

> Before confirming a Chapter 11 reorganization plan, a
> bankruptcy court must review the terms of the proposed plan
> to ensure that it complies with the applicable provisions of
> the Code. When the court later interprets the plan, it
> interprets words on which it has already passed judgment.
> We afford that interpretation full deference on review. We
> overturn the bankruptcy court's interpretation "only if the
> record shows an abuse of discretion in the interpretation."

*Id.* (citations omitted); *accord JCB, Inc. v. Union Planters Bank*, 539 F.3d 862, 869 (8th Cir. 2008) ("a bankruptcy court's . . . interpretation of the confirmed plan is

1  entitled to deference as an interpretation of its own order and 'should be reviewed

2  under the abuse of discretion standard'") (citation omitted); *Stumpf v. McGee (In re*

3  *O'Connor)*, 258 F.3d 392, 401 (5th Cir. 2001) (bankruptcy court's "interpretation [of

4  a plan] is entitled to deference"); *Terex Corp. v. Metro. Life Ins. Co. (In re Terex*

5  *Corp.)*, 984 F.2d 170, 172 (6th Cir. 1993) ("we review the [bankruptcy court's]

6  interpretation of the Plan with full deference").[1]  "Decisions committed to the

7  bankruptcy court's discretion will be reversed only if 'based on an erroneous

8  conclusion of law or when the record contains no evidence on which [the bankruptcy

9  court] rationally could have based that decision.'"  *Benedor Corp. v. Conejo Enters.*

10  *(In re Conejo Enters.)*, 96 F.3d 346, 351 (9th Cir. 1996) (citation omitted).[2]

11      **2.**    Whether the bankruptcy court erred in refusing to modify the

12  Creditor Trust Agreement, which DMA admits is part of the Plan, where DMA

13  conceded that the Plan has been substantially consummated and cannot be modified?

14  The bankruptcy court's refusal to modify the Creditor Trust Agreement was based on

15  both findings of fact and conclusions of law.  Its conclusions of law are reviewed *de*

16  *novo*, *see*, *e.g.*, *Decker v. Tramiel (In re JTS Corp.)*, 617 F.3d 1102, 1109 (9th Cir.

17  2010), and its findings of fact are reviewed for clear error, *see* Fed. R. Bankr. P. 8013

18  ("Findings of fact . . . shall not be set aside unless clearly erroneous, . . . .").  "'[A]

19  finding is 'clearly erroneous' when although there is evidence to support it, the

20  reviewing court on the entire evidence is left with the definite and firm conviction that

21  a mistake has been committed.'"  *Anderson v. Bessemer City*, 470 U.S. 564, 573-74

22

23  _____
[1] *See Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow*
24  *Corning Corp.)*, 456 F.3d 668, 674-76 (6th Cir. 2006) ("Many of our sister circuits
similarly review a bankruptcy court's interpretation of the plan for abuse of
25  discretion.") (collecting cases); *Gen. Elec. Capital Corp. v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms, Inc.)*, 341 F.3d 738, 744 (8th Cir. 2003) ("We agree with our sister
26  circuits that a bankruptcy court's interpretation of a confirmed plan should be
reviewed under the abuse of discretion standard.") (collecting cases).
27  [2] Citing *Smith v. Miller (In re Dominguez)*, 995 F.2d 883 (9th Cir. 1993), DMA
incorrectly asserts that the bankruptcy court's interpretation of the Plan is subject to *de*
28  *novo* review.  *See* Appellant's Opening Brief ("AOB") 20.  *Smith* is inapposite; it did
not involve interpretation of a confirmed reorganization plan.  *See* 995 F.2d at 885-86.

(1985) (citation omitted).  "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."  *Id.*  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Id.*

        **3.**     Whether DWMC, which successfully opposed DMA's Extension Motion below and is admittedly DMA's largest creditor, lacks prudential standing to defend on appeal the bankruptcy court's order denying the Extension Motion?

## STATEMENT OF THE CASE AND FACTS

### A.    The Plan And The Creation Of The Creditor Trust

        DMA was the exclusive distributor in the United States of Daewoo vehicles manufactured by DWMC, and was a wholly-owned subsidiary of DWMC. RJN, Ex. 1 at 2 ¶ 2.[3]  On May 16, 2002, DMA filed a voluntary petition for bankruptcy under chapter 11 of title 11 of the United States Code.  3 ER 393.  On October 8, 2003, the bankruptcy court confirmed DMA's Plan, with an effective date of October 16, 2003.  1 ER 18-133; 4 ER 580; 3 ER 402.  The Plan was implemented through the creation of a Creditor Trust.  3 ER 447.  The "primary role" of the Creditor Trust and the Trustee is "to distribute the assets of the Creditor Trust to the holders of Allowed Claims in accordance with the terms of the Plan and the Creditor Trust Agreement."  3 ER 449.  The Creditor Trust Agreement is expressly part of the Plan, 3 ER 418-420; 2 ER 138; AOB 21, which may be modified only pursuant to 11 U.S.C. § 1127, 3 ER 484.

### B.    The Term Of The Creditor Trust

        The Plan provides that:  "The Creditor Trust shall not have a term greater than five years from its date of creation, unless extended from time to time pursuant to the terms of the Creditor Trust Agreement."  3 ER 450.  This is the only provision of

---

[3] "ER" refers to DMA's Excerpts of Record.  For example, 1 ER 19 refers to Volume 1, page 19 of DMA's Excerpts of Record.  "SER" and "RJN" refer to DWMC's concurrently filed Supplemental Excerpts of Record and Request for Judicial Notice.

**BRIEF OF APPELLEE**

the Plan that addresses either the term of the Creditor Trust or extending the term of the Creditor Trust.  Section 2.8 of the Creditor Trust Agreement provides, in relevant part, that:  "[T]he term of the Trust may be extended for a finite term beyond the fifth (5th) anniversary of the Effective Date if the following conditions are met:  (A) not later than six (6) months prior to the beginning of the extended term of the Trust, the Court approves such extension . . . ."  4 ER 604.  Thus, the term of the Creditor Trust may be extended only *if* the bankruptcy court approves the extension "not later than six (6) months *prior* to the beginning of the extended term of the Trust."

The Creditor Trust Agreement also provides that:  "This Agreement . . ., the Plan, and the Court Orders constitute the entire agreement by and among the parties, and there are no representations, warranties, covenants, or obligations except as set forth herein and in the Plan."  4 ER 612.  It further provides that:  "This Agreement, the Plan, and the Court Orders supersede all prior and contemporaneous agreements, undertakings, negotiations, and discussions, written or oral, if any, of the parties hereto relating to any transaction contemplated hereunder."  *Id.*

## C.    DMA's First Motion To Extend The Term Of The Creditor Trust

The Creditor Trust was initially scheduled to end on October 16, 2008 – five years after the October 16, 2003 effective date of the Plan.  4 ER 572; 1 SER 12.  On March 2, 2007, in compliance with § 2.8 of the Creditor Trust Agreement, DMA moved to extend the term of the Creditor Trust to June 30, 2011 ("2007 Motion").  1 SER 12.  On May 4, 2007, the bankruptcy court granted DMA's 2007 Motion, extending the term of the Creditor Trust to June 30, 2011.  4 ER 617-19.

## D.    DWMC's $118 Million Judgment Against DMA

On November 18, 2002, DWMC filed a Proof of Claim in DMA's bankruptcy case for $158,956,488.79, consisting of $122,729,359.79 for vehicles and parts that DMA purchased pursuant to the parties' distribution agreement, but for which it did not pay, plus $36,227,129.00 in interest.  RJN, Ex. 1 at 2 ¶ 3.  On July 28, 2003, DMA filed an objection to DWMC's Proof of Claim and counterclaims against

4

1   DWMC, commencing an adversary proceeding entitled *Daewoo Motor Am., Inc. v.*

2   *Daewoo Motor Co., Ltd.*, No. 2:03-2155-BB ("Adversary Proceeding"). *Id.* at 2 ¶ 4.

3          After various dismissals and summary adjudications, two of DMA's

4   counterclaims remained, a counterclaim for Declaratory Relief ("Recharacterization

5   Claim"), and a counterclaim for Breach of Contract ("Breach of Contract Claim"). *Id.*

6   at 2-3 ¶¶ 4-8.  In its Recharacterization Claim, DMA sought to recharacterize from

7   debt to equity the amounts that it owed to DWMC for vehicles and parts, as reflected

8   in DWMC's Proof of Claim. *Id.* at 3 ¶ 9.  In its Breach of Contract Claim, DMA

9   claimed that DWMC failed to provide DMA vehicles and parts, and failed to

10  reimburse DMA for warranty and free maintenance expenses. *Id.*  DMA's

11  Recharacterization and Breach of Contract Claims were tried to the bankruptcy court

12  on March 23-25, 2010 and May 6, 2010. *Id.* at 1 ¶ 1.

13         At the close of DMA's case-in-chief, the bankruptcy court granted

14  DWMC's motion for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c).

15  *Id.*  As a result, it entered judgment for DWMC against DMA in the amount of

16  $118,131,046.99, and concluded that DWMC has an allowed general unsecured claim

17  in DMA's bankruptcy case in that amount. *Id.* at 26 ¶ 68; RJN, Ex. 2 at 2.[4]  DMA has

18  appealed the bankruptcy court's judgment to this Court.  AOB 5.

19      **E.     The Status Of Cash In The Creditor Trust And Claims Against It**

20         Under the Plan, creditors in Classes 14-17 are entitled to "a Pro Rata

21  distribution under the terms of the Creditor Trust."  3 ER 437-39.  As explained

22  above, the bankruptcy court determined that DWMC has an allowed general

23  unsecured claim (Class 17) in the amount of $118,131,046.99.  RJN, Ex. 2 at 2.  DMA

24  conceded, and the bankruptcy court found, that unless the bankruptcy court's

25  judgment in the Adversary Proceeding is reversed on appeal, DWMC is the largest

---

[4] DMA spends several pages of its brief arguing that DWMC breached the parties' distribution agreement, "pushed DMA into Chapter 11 bankruptcy," and caused "millions of dollars in losses" to DMA's creditors, and that DWMC is not a "legitimate creditor."  AOB 4-8.  Those arguments have no relevance to this appeal and they were all previously and correctly rejected by the bankruptcy court.

**BRIEF OF APPELLEE**

1   unsecured creditor of DMA.  2 ER 156, 167-68.  All of the other allowed claims in

2   Classes 14-17 *combined* total only $108,035,702.37.  6 ER 1076.  Thus, including

3   DWMC's claim, there is a total of $226,166,749.36 in allowed claims in Classes 14-

4   17, with DWMC's claim comprising more than half of that amount.

5            Until the Creditor Trust terminates, the cash in the Trust may be used to

6   pay DMA's litigation expenses.  1 ER 89-90.  Once it terminates, however, that cash

7   may be used only to pay the Trust's own expenses and to make distributions to

8   DMA's general unsecured creditors in Classes 14-17.  *See* Decl. of Michael L. Joncich

9   [Docket No. 35], at 8 ¶ 7.  The Creditor Trust is the only source for distributions to

10  such creditors.  3 ER 437-39.  Therefore, every dollar in the Trust that is used to pay

11  DMA's litigation expenses reduces the amount available to pay creditors, including

12  DWMC.[5]  As of March 31, 2011, the Creditor Trust had a total of $1,879,408.61 in

13  cash on hand for potential distribution to Class 14-17 creditors.  3 ER 549.  But, that

14  cash has been rapidly dwindling, as the Trustee has been spending it at a rate of more

15  than $150,000 per month.  3 ER 382.[6]  DMA acknowledges that it is appealing the

16  order denying the Extension Motion so that the Trustee can continue to use the cash in

17  the Creditor Trust to pay DMA's litigation expenses.  AOB 2.

18        **F.    The Bankruptcy Court's Denial Of DMA's Extension Motion**

19            DMA filed its Extension Motion on April 8, 2011, requesting that the

20  bankruptcy court:  (1) "extend the current term of the Creditor Trust by an additional

21  three (3) years, from June 30, 2011 to June 30, 2014;" and (2) "approve the following

22  modification to paragraph 2.8(ii)(A) of the DMA Creditor Trust Agreement . . .:  '(A)

23  _____

24  [5] Because of DMA's appeal of the judgment in the Adversary Proceeding, DWMC does not yet have an "Allowed Claim," as that term is defined in the Plan.  However, if the Trustee makes any distribution to Class 14-17 creditors, DWMC is entitled, at a

25  minimum, to have its *pro rata* share reserved and held pending completion of the appeal process and the final determination of its claim.  1 ER 88; 4 ER 606.

26  [6] Over the past nearly eight years, the Trustee has spent this money primarily on DMA's attorneys' fees.  For example, it paid DMA's attorneys (a) more than $1.3

27  million in an unsuccessful attempt to recover $57,000 from DWMC, 5 ER 958-59, 967, and (b) more than $540,000 to prepare its opening brief in DMA's appeal of the

28  bankruptcy court's judgment in the Adversary Proceeding, 3 ER 544, 546.

**BRIEF OF APPELLEE**

1  not later than **within**  six (6) months prior to **of** the beginning of the **each** extended

2  term of the Trust, the Court approves such extension . . . .'"  4 ER 567.  The Trustee

3  joined the Extension Motion, but did not file a substantive brief.  3 ER 563-64.

4        DWMC opposed the Extension Motion, urging that it should be denied

5  for four reasons.  *First*, DMA's request to extend the term of the Creditor Trust was

6  untimely under the express and unambiguous terms of § 2.8 of the Creditor Trust

7  Agreement, because any such extension had to be approved by the bankruptcy court

8  before January 1, 2011.  3 ER 554-55.  *Second*, the Creditor Trust Agreement is part

9  of the Plan and, under 11 U.S.C. § 1127(b), the substantially consummated Plan

10  cannot be modified.  3 ER 556-58.  *Third*, DMA's request was based on false

11  premises as to what the Plan and Internal Revenue Service Revenue Procedure 94-45

12  ("Revenue Procedure 94-45") require.  3 ER 558-60.  *Fourth*, there was no possibility

13  that the Adversary Proceeding would be concluded by June 30, 2014, and the funds

14  remaining in the Creditor Trust would be exhausted before that date.  3 ER 560-62.

15        At a May 17, 2011 hearing, the bankruptcy court denied the Extension

16  Motion.  It found that the language of § 2.8 of the Creditor Trust Agreement was not

17  ambiguous, rejecting DMA's claim that it was.  2 ER 137-38, 142, 150-52, 164, 173-

18  74, 187-88.  It further found that, because the Creditor Trust was scheduled to expire

19  on June 30, 2011, the bankruptcy court would have had to approve any further

20  extension by January 1, 2011, and because that did not occur, the Extension Motion

21  was untimely.  *Id.*

22        The bankruptcy court also denied DMA's request to modify § 2.8 of the

23  Creditor Trust Agreement, finding that such modification would be a modification of

24  the Plan and that modification of the Plan was no longer permissible because, as DMA

25  conceded, 3 ER 370, the Plan had been substantially consummated.  2 ER 138, 142-

26  43.  The bankruptcy court found that the provisions of § 2.8 governing the term of the

27  Creditor Trust and the procedure for extending the Creditor Trust were "material" –

28  not "ministerial" – provisions of the Plan.  2 ER 140, 158-59, 165, 169.  It also found

**BRIEF OF APPELLEE**

1  it "telling" that DMA complied with the timing requirement of § 2.8 when it sought to

2  extend the term of the Creditor Trust for the first time in 2007.  2 ER 141.

3          Finally, the bankruptcy court rejected DMA's argument, raised for the

4  first time at the hearing on the Extension Motion, that § 2.8 of the Creditor Trust

5  Agreement should be reformed due to a mutual mistake.  It found that the Plan was

6  not simply a two-party agreement between DMA and the creditors committee; rather,

7  the Plan also includes, as parties, thousands of DMA creditors, and there was no

8  evidence that those creditors believed that § 2.8 contained a mistake.  2 ER 157, 165.

9  Further, it found that the change DMA requested was not "non-substantive" or

10  "clerical," but a "material modification" with "significant economic and other

11  repercussions."  2 ER 158-59, 168-69.  The bankruptcy court noted that DMA did not

12  raise its mistake argument in the 2007 Motion, and that "the only reason that you

13  [DMA] now concluded that this was a mistake is, frankly, because you blew the

14  deadline, right?"  2 ER 159.

15          On May 17, 2011, the bankruptcy court entered an order denying DMA's

16  Extension Motion ("May 17 Order") "[f]or the reasons set forth on the record at the

17  time of hearing on the Motion, and other good cause appearing therefor."  1 ER 3-4.

18                          **SUMMARY OF ARGUMENT**

19          From October 2003 until April 2011, DMA operated under the terms of

20  the Plan and the Creditor Trust Agreement, including § 2.8 of the Creditor Trust

21  Agreement, and never once during those seven and a half years did it assert that § 2.8

22  conflicted with the Plan or that it contained a mistake that needed to be modified.

23  Then, DMA "blew the deadline" imposed by § 2.8 for obtaining court approval of the

24  extension of the term of the Creditor Trust.  Unwilling to admit that it "blew the

25  deadline," DMA argued that § 2.8 meant something other than what it said because it

26  purportedly conflicted with the Plan and contained a mistake.  The bankruptcy court

27  correctly rejected DMA's arguments and entered the May 17 Order denying DMA's

28  Extension Motion.  The May 17 Order should be affirmed.

**BRIEF OF APPELLEE**

1         *First*, the bankruptcy court did not abuse its discretion in concluding that

2  DMA's Extension Motion was untimely under the express terms of the Plan.  DMA

3  does not challenge here the bankruptcy court's finding that the language of the Plan,

4  including § 2.8 of the Creditor Trust Agreement, is unambiguous.  Nor does it argue

5  that the bankruptcy court's interpretation of the Plan leads to an absurd result.  Thus,

6  the intent of the parties must be determined solely from the language of the Plan.

7  Section 2.8, which is part of the Plan, provided that the Creditor Trust's term may be

8  extended only *if*, "not later than six (6) months *prior* to the beginning of the extended

9  term of the Trust, the Court approves such extension."  DMA admits it did not comply

10  with § 2.8.  Under § 2.8, the bankruptcy court would have had to approve any

11  extension of the Creditor Trust by no later than *January 1, 2011*.  However, DMA did

12  not even file its Extension Motion until *April 8, 2011*.  DMA's Motion was untimely,

13  and the bankruptcy court did not abuse its discretion in denying it for that reason.

14         The bankruptcy court correctly rejected DMA's attempt to use extrinsic

15  evidence to change the terms of, or eliminate, § 2.8 of the Creditor Trust Agreement.

16  It properly rejected DMA's contentions that the Plan incorporated by reference

17  Revenue Procedure 94-45's non-mandatory guideline concerning the timing of

18  approval of an extension of the term of a trust, and that the Plan's fleeting reference to

19  Revenue Procedure 94-45 created a conflict between the Plan and the Creditor Trust

20  Agreement.  DMA's argument that the Plan incorporated Revenue Procedure 94-45's

21  guideline would impermissibly render meaningless both the Plan's explicit statement

22  that extension of the Creditor Trust would occur in accordance with the Creditor Trust

23  Agreement and the language of § 2.8.  The bankruptcy court also correctly rejected

24  DMA's attempt to use assertions by its and the Trustee's outside counsel to contradict

25  the terms of the Plan.  Such unsworn assertions of counsel are not evidence.  But, even

26  if they were evidence, they would still be irrelevant because they say nothing of the

27  intent of the thousands of creditors that are also parties to the Plan.  Finally, DMA's

28

**BRIEF OF APPELLEE**

attempt to use counsel's statements to vary or negate the terms of § 2.8 is an improper use of extrinsic evidence under California law.

*Second*, the bankruptcy court correctly rejected DMA's request to modify the terms of § 2.8 of the Creditor Trust Agreement.  DMA now concedes that the Creditor Trust Agreement is part of the Plan and that the Plan has been substantially consummated and cannot be modified.  Those concessions are fatal to DMA's modification argument.  Therefore, on appeal, DMA now argues that it seeks an *interpretation*, not a *modification*.  But, that argument is wholly inconsistent with DMA's briefs below, in which it forthrightly and repeatedly sought a "modification" of the Creditor Trust Agreement.  The relief DMA requests is not an interpretation because the only way to achieve the result DMA seeks is to eliminate or change the language of § 2.8.  That is the very definition of modification, and, as DMA concedes, the Plan (of which the Creditor Trust Agreement is a part) cannot be modified.

*Finally*, DMA's afterthought argument that DWMC lacks appellate standing to defend the bankruptcy court's May 17 Order on appeal is meritless.  The "person aggrieved" test upon which DMA relies applies to *appellants*, not to *appellees* like DWMC.  DMA's lone case to the contrary is neither binding nor persuasive.  Moreover, even if the "person aggrieved" test applies to appellees, DWMC satisfies it.  DWMC is DMA's largest creditor.  (Indeed, it is larger than all of DMA's other unsecured creditors combined.)  DWMC has a pecuniary interest that would be directly and adversely affected if the bankruptcy court's May 17 Order were reversed because such reversal would allow further transfers of assets from a limited fund – the Creditor Trust – that would otherwise be used to pay DWMC's claim.

## ARGUMENT

**I.    The Bankruptcy Court Did Not Abuse Its Discretion In Finding That
      DMA's Motion To Extend The Term Of The Creditor Trust Was Untimely**

The bankruptcy court interpreted the Plan that it confirmed, including the timing requirement of § 2.8 of the Creditor Trust Agreement, and concluded that

10

DMA's Extension Motion was untimely.  That conclusion is reviewed only for abuse of discretion, *see supra* at 1-2, and the bankruptcy court did not abuse its discretion.

**A.  The Bankruptcy Court Correctly Concluded That DMA's Extension Motion Was Untimely Under § 2.8 Of The Creditor Trust Agreement**

The Plan and the Creditor Trust Agreement are interpreted in accordance with California and federal law.  AOB 19; 1 ER 123-24; 4 ER 611.  Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."  Cal. Civ. Code § 1636.  As DMA concedes, "'the intention of the parties is to be ascertained from the writing alone, if possible.'"  AOB 20 (citation omitted).

More specifically, absent ambiguity or absurdity, a court's analysis of the intent of the parties begins and ends with the language of the parties' agreement.  *See* Cal. Civ. Code § 1638 ("INTENTION TO BE ASCERTAINED FROM LANGUAGE.  The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."); Cal. Civ. Code § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; . . . .").  For example, in *Apra v. Aureguy*, 55 Cal. 2d 827, 830-31 (1961), the California Supreme Court determined that the terms of a loan agreement between the parties were "clear and unambiguous."  As a result, it rejected plaintiff's argument to employ a rule of construction to attempt to vary those terms, stating that "neither the trial court nor this court is empowered to make for the parties a contractual arrangement which they did not see fit to make themselves."  *Id.*  It explained that:  "'[I]n the absence of fraud or mistake, the intention of the parties as expressed in the agreement is controlling, and courts are not empowered under the guise of construction or explanation to depart from the plain meaning of the writing and insert a term or limitation not found therein.'"  *Id.* (citation omitted).  Further, it stated that:  "'"It is a general rule governing the construction of contracts that unless a contract is ambiguous, its meaning must be determined from the words used; and

**BRIEF OF APPELLEE**

1   courts will not, because a more equitable result might be reached thereby, construe

2   into the contract provisions that are not therein.'"" *Id.* (citation omitted); *see also Ede*

3   *v. Ede*, 208 Cal. App. 2d 718, 720-21 (1962) (refusing to consider party's undisclosed

4   intention in interpreting unambiguous agreement); *Grosse v. Barman*, 9 Cal. App.

5   650, 663 (1909) (affirming exclusion of "evidence concerning the circumstances

6   under which the agreement was made" because the agreement was "free from

7   uncertainty and ambiguity").

8          Here, DMA does not challenge the bankruptcy court's finding that the

9   timing requirement of § 2.8 of the Creditor Trust Agreement is unambiguous.[7]  Nor

10   does DMA argue that the bankruptcy court's interpretation of the Plan, including §

11   2.8, leads to an absurd result.  Thus, the intent of the parties must be determined solely

12   from the language of the Plan, including § 2.8.  That language demonstrates that the

13   bankruptcy court's denial of DMA's Extension Motion as untimely was not an abuse

14   of discretion.

15          After its term had been extended in 2007, the Creditor Trust was

16   scheduled to terminate on June 30, 2011.  *See supra* at 4.  The Plan provides that the

17   Creditor Trust may be "extended from time to time pursuant to the terms of the

18   Creditor Trust Agreement."  3 ER 450.  The Creditor Trust Agreement is an integrated

19   contract, 4 ER 612; *see supra* at 4, and under § 2.8 of the Creditor Trust Agreement,

20   the Creditor Trust's term may be extended only if, "not later than six (6) months *prior*

21   to the beginning of the extended term of the Trust, the Court approves such

22   extension." 4 ER 604 (emphasis added).  Because July 1, 2011 would be the

23   beginning of any "extended term of the Trust," the bankruptcy court would have had

24   to approve any extension by no later than January 1, 2011.  DMA concedes that no

25   such approval was sought or obtained by that date.  AOB 19.  Instead, DMA filed its

26   Extension Motion on April 8, 2011 – more than three months later.  The bankruptcy

27

28   ---
    [7] Below, DMA argued § 2.8 of the Creditor Trust Agreement is ambiguous, 4 ER 567,
    573; 2 ER 146-50, but it has abandoned that argument on appeal.

**BRIEF OF APPELLEE**

court appropriately denied the Extension Motion as untimely based on the
unambiguous terms of § 2.8.

### B. DMA's Arguments Confirm That The Bankruptcy Court Did Not Abuse Its Discretion In Denying The Extension Motion

On appeal, DMA concedes that its Extension Motion was untimely under
the terms of § 2.8 the Creditor Trust Agreement.  However, it argues that those terms
should be ignored for two reasons.  Neither supports the conclusion that the
bankruptcy court abused its discretion in interpreting the Plan it confirmed.

#### 1. The Plan's Reference To Revenue Procedure 94-45 Does Not Change The Terms Of Or Negate § 2.8 Of The Creditor Trust Agreement

DMA argues that there is a "conflict" between the Plan and the Creditor
Trust Agreement because, by "referencing" Revenue Procedure 94-45 in the Plan, the
parties intended to incorporate by reference each and every term of that document,
including its guideline that "each extension be approved by the court *within 6 months*
of the beginning of the extended term."  *See* AOB at 18-22.  DMA is incorrect.

The Plan does not incorporate by reference the terms of Revenue
Procedure 94-45.  "For the terms of another document to be incorporated into the
document executed by the parties the reference must be clear and unequivocal, the
reference must be called to the attention of the other party and he must consent
thereto, and the terms of the incorporated document must be known or easily available
to the contracting parties."  *Shaw v. Regents of the Univ. of Cal.*, 58 Cal. App. 4th 44,
54 (1997) (internal quotation marks and citation omitted).  Here, none of those
requirements are met.  The Plan refers to Revenue Procedure 94-45 only once, and it
does not state that it is being incorporated by reference.  3 ER 450.  The Plan also does
not state (and DMA does not present any evidence) that all of the parties to the Plan
consented to its incorporation by reference or that Revenue Procedure 94-45 was
known by or easily available to all of the parties to the Plan.  *See Amtower v. Photon
Dynamics, Inc.*, 158 Cal. App. 4th 1582, 1607-09 (2008) ("[T]he mention of the

13

**BRIEF OF APPELLEE**

1    Merger Agreement in these provisions is not the same as specifically directing the

2    parties' attention to the terms of the external document in a manner that could be

3    construed as eliciting the parties' consent to its separate terms.").  By contrast, when a

4    document was incorporated by reference into the Plan, it was done expressly and in

5    compliance with the *Shaw* requirements.  3 ER 419-20 ("All exhibits to the Plan and

6    all documents contained in the Plan Documents Supplement are incorporated into and

7    are a part of the Plan as if set forth in full herein."); 3 ER 418 (providing that the

8    Creditor Trust Agreement and other documents were contained in the Plan Documents

9    Supplement).  The fact that there is no such clear, unequivocal language with respect

10   to Revenue Procedure 94-45, and that Revenue Procedure 94-45 is not included in the

11   Plan Documents Supplement, shows that it was not incorporated by reference.[8]

12           Moreover, contrary to DMA's assertion, there is no "conflict" between

13   the Plan's "referenc[e]" to Revenue Procedure 94-45 and § 2.8 of the Creditor Trust

14   Agreement.  The Plan provides that:  "Pursuant to . . . Revenue Procedure 94-45 and

15   any requirement of federal income tax law, the Estate will treat the transfer of the

16   Creditor Trust Assets for federal income tax purposes as a deemed transfer of such

17   assets to the creditors who are beneficiaries of the Creditor Trust followed by a

18   deemed transfer of such assets by creditors to the Creditor Trust in exchange for

19   beneficial interests therein."  3 ER 450.[9]  That is the *only* reference in the Plan to

20   _____
     [8] DMA's authorities concerning incorporation by reference are inapposite.  In *Shaw*,
21   unlike here, the document the court found to be incorporated by reference was
     attached to the agreement, the agreement directed the parties to read the document,
22   and the agreement referred to the particular provision of the incorporated document
     that was at issue in the case.  *Shaw*, 58 Cal. App. 4th at 53-54.  Moreover, in both
23   *Shaw* and *Medtronic, Inc. v. White*, 526 F.3d 487, 496-97 (9th Cir. 2008), the parties
     did not attempt to incorporate a document into an agreement that would negate an
24   express term of the agreement.  That is precisely what DMA seeks to do here.

25   [9] DMA suggests that compliance with all of the provisions of Revenue Procedure 94-
     45 is mandatory in order to obtain the "*most favorable*" federal income tax treatment.
26   AOB 18.  That is incorrect.  "It is well-established that, as a general rule, 'the I.R.S.'s
     Revenue Procedures are directory not mandatory.'"  *Estate of Shapiro v. Comm'r of*
27   *Internal Revenue*, 111 F.3d 1010, 1017 (2d Cir. 1997) (citations omitted); *accord id.*
     ("In other words, the 'failure to comply with [a] Revenue [Procedure] . . . is not
28   dispositive, as IRS procedures are mere guidelines without the force of law.'")
     (citations omitted); *see United States v. Toyota of Visalia*, 772 F. Supp. 481, 486 (E.D.
     Cal. 1991) ("[A Revenue Procedure] does not have the force and effect of law and

14

1   Revenue Procedure 94-45.  It does not mention – let alone require compliance with –

2   Revenue Procedure 94-45's guideline concerning the timing of approval of an

3   extension of a trust.  Rather, only 20 lines after the reference to Revenue Procedure

4   94-45, the Plan provides that:  "The Creditor Trust shall not have a term greater than

5   five years from its date of creation, *unless extended from time to time pursuant to the*

6   *terms of the Creditor Trust Agreement*."  3 ER 450 (emphasis added).  As explained

7   above, § 2.8 of the Creditor Trust Agreement unambiguously sets forth the

8   requirement for the timing of approval of an extension of the term of the Creditor

9   Trust.  Thus, there is no conflict between the Creditor Trust Agreement and the Plan.

10  *See*, *e.g.*, *Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 214 Cal. App. 3d 1, 16-

11  18 (1989) (rejecting argument that agreement should be construed to contain waiver of

12  liability language required by NASA because the agreement unambiguously contained

13  different waiver of liability language).

14          The bankruptcy court's interpretation properly avoided any potential

15  conflict.  *See Friedman Prof'l Mgmt. Co. v. Norcal Mut. Ins. Co.*, 120 Cal. App. 4th

16  17, 33 (2004) ("Courts must interpret insurance policies, like all contracts, to try to

17  give effect to every clause and harmonize the various parts with each other."); *People*

18  *ex rel. Dep't of Parks & Recreation v. West-A-Rama, Inc.*, 35 Cal. App. 3d 786, 793

19  (1973) ("It is a cardinal rule of construction that a contract is to be construed as a

20  whole, effecting harmony among and giving meaning to all the parts thereof."); *see*

21  *also Peterson v. Minidoka County Sch. Dist. No. 331*, 118 F.3d 1351, 1359 (9th Cir.

22  1997) ("The usual rule of interpretation of contracts is to read provisions so that they

23  harmonize with each other, not contradict each other.").

24

25

26  thus is not binding on the I.R.S."), *aff'd*, 988 F.2d 126 (9th Cir. 1993).  Indeed,
    Revenue Procedure 94-45 expressly provides that it does not "define, as a matter of
27  law, the circumstances under which an organization will be classified as a liquidating
    trust for federal income tax purposes."  4 ER 625.  Rather, it is "intended solely to
28  assist taxpayers and their representatives in preparing ruling requests."  *Id*.  No ruling
    request was made in this case.

**BRIEF OF APPELLEE**

1    Further, DMA's interpretation would essentially write out of the Plan the

2    express provision that extensions of the Creditor Trust would be made "pursuant to

3    the terms of the Creditor Trust Agreement" and likewise eliminate the timing

4    requirement of § 2.8 of the Creditor Trust Agreement.  California law prohibits such

5    an interpretation.  *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken

6    together, so as to give effect to every part, if reasonably practicable, each clause

7    helping to interpret the other."); *Headlands Reserve, LLC v. Ctr. for Natural Lands

8    Mgmt.*, 523 F. Supp. 2d 1113, 1126 (C.D. Cal. 2007) ("'Courts must interpret

9    contractual language in a manner which gives force and effect to *every* provision, and

10   not in a way which renders some clauses nugatory, inoperative, or meaningless.'")

11   (quoting *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal.

12   App. 4th 445, 473-74 (1998)); *Founding Members of the Newport Beach Country

13   Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 957 (2003) ("An

14   interpretation rendering contract language nugatory or inoperative is disfavored.").

15   Finally, even if there were a conflict between the Plan's general reference

16   to Revenue Procedure 94-45 and the specific provisions of § 2.8 of the Creditor Trust

17   Agreement (and there is not), that conflict would have to be resolved in favor of § 2.8.

18   *See*, *e.g.*, *Nat'l Ins. Underwriters v. Carter*, 17 Cal. 3d 380, 386 (1976) ("Under well

19   established principles of contract interpretation, '. . . when a general and particular

20   provision are inconsistent, the latter is paramount to the former.'") (citation omitted).

21       **2.    The Unsworn Statements Of Outside Counsel For DMA And
22              The Trustee Do Not Change The Terms Of Or Negate § 2.8 Of
                The Creditor Trust Agreement**

23   DMA also argues that unsworn assertions from counsel for DMA and the

24   Trustee, made at the hearing on the Extension Motion, show that the parties intended

25   "to comply with Revenue Procedure 94-45."  AOB 23.  Again, DMA is incorrect.

26   Unsworn statements of counsel are not evidence and cannot be considered.  *See Tapco

27   Prods. Co. v. Van Mark Prods. Corp.*, 446 F.2d 420, 428-29 (6th Cir. 1971) (holding

28   that district court erred in relying upon a demonstration by defendants' counsel, who

**BRIEF OF APPELLEE**

was not sworn as a witness, because "[t]he unsworn, self-serving statements of counsel are not evidence"); *see also Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) ("An attorney's unsworn statements in a brief are not evidence."); *Skyline Corp. v. NLRB*, 613 F.2d 1328, 1337 (5th Cir. 1980) (same); *Jordan v. Warehouse Servs., Inc.*, 81 F. Supp. 2d 1257, 1264 n.10 (M.D. Ala. 2000) ("Counsel for Plaintiff's unsworn statement . . . is not evidence and, thus, cannot be considered . . . .").[10]

Even if the statements of DMA's and the Trustee's counsel had been made in sworn testimony, they would still be irrelevant to determining the intent of the parties. As DMA concedes, the Plan "'is essentially a contract between the debtor [DMA] and [its] creditors.'" AOB 19 (citation omitted). The statements of DMA's and the Trustee's counsel do not represent the intent of DMA's "several thousand" creditors. AOB 2. Evidence concerning the subjective, unexpressed intent of counsel for only two parties to the Plan is irrelevant to determining the intent of all the parties. *See Renwick v. Bennett (In re Bennett)*, 298 F.3d 1059, 1064 (9th Cir. 2002) ("'Although the intent of the parties determines the meaning of the contract, the relevant intent is 'objective'—that is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent.'") (citation omitted); *Headlands Reserve*, 523 F. Supp. 2d at 1128 ("One party's subjective and undisclosed intent is simply irrelevant to contract interpretation."); *Brinton v. Bankers Pension Servs., Inc.*, 76 Cal. App. 4th 550, 560-61 (1999) ("[W]here a person's words or acts, judged by a reasonable standard, manifest an intent to agree to a certain matter, that agreement is established, regardless of what may have been the person's real but unexpressed state of mind on the subject.").

Moreover, DMA is seeking to use statements from its and the Trustee's counsel to change or negate (rather than interpret) the terms of § 2.8 of the Creditor Trust Agreement. That is not a permissible use of extrinsic evidence. *See*, *e.g.*,

---

[10] DMA's reliance (AOB 23 n.8) upon *Garcia v. Truck Ins. Exch.*, 36 Cal. 3d 426, 434-39 (1984), is misplaced. There, unlike here, the attorney provided sworn trial testimony, not simply assertions during argument at a hearing.

17

**BRIEF OF APPELLEE**

*Monterey/Santa Cruz County Bldg. & Constr. Trades Council v. Cypress Marina Heights LP*, 191 Cal. App. 4th 1500, 1516 (2011) (holding that extrinsic evidence that would "negate" a provision of the agreement "was irrelevant and inadmissible"); *Winet v. Price*, 4 Cal. App. 4th 1159, 1167 (1992) ("[P]arol evidence is admissible only to prove a meaning to which the language is 'reasonably susceptible', not to flatly contradict the express terms of the agreement.") (citation omitted); *West-A-Rama*, 35 Cal. App. 3d at 791, 793 (holding that extrinsic evidence was inadmissible to show that the parties intended the agreement to say something other than what it said because "extrinsic evidence 'cannot serve to create or alter the obligations under the instrument'") (citation omitted); *Larsen v. Johannes*, 7 Cal. App. 3d 491, 500 (1970) ("Parol evidence is not admitted to show that the appellants 'meant something other *than* what they said but by showing what they meant *by* what they said.'") (citation omitted); *Sass v. Hank*, 108 Cal. App. 2d 207, 214 (1951) ("As a material provision cannot be added to a contract upon parol proof received for the sole purpose of explaining an ambiguity so an important covenant cannot be stricken from a written contract solely upon the *ipse dixit* of a party thereto.").

Finally, if this Court were inclined to consider extrinsic evidence of the parties' intent – and it should not because the terms of the Plan and § 2.8 of the Creditor Trust Agreement are clear and unambiguous – it should consider DMA's conduct in connection with the 2007 Motion. There, in full compliance with the timing requirement of § 2.8 (and not the timing guideline in Revenue Procedure 94-45), DMA sought and obtained the bankruptcy court's approval of the first extension of the term of the Creditor Trust *more than a year before the beginning of the extended term. See supra* at 4. As the bankruptcy court found, that conduct shows that DMA and the Trustee intended the language of § 2.8 to be what it is and that they did not find any conflict between that language and the Plan. 2 ER 141.

*** 

18

**BRIEF OF APPELLEE**

In summary, the bankruptcy court did not abuse its discretion in interpreting the Plan to require the denial of DMA's Extension Motion as untimely.

## II.    DMA Concedes That The Bankruptcy Court Did Not Err In Refusing To Modify The Creditor Trust Agreement

In addition to interpreting the Plan to require the denial of DMA's Extension Motion as untimely, the bankruptcy court also rejected DMA's request to modify the terms of § 2.8 of the Creditor Trust Agreement.  *See supra* at 7-8; *see also* AOB 23 ("DMA asked the bankruptcy court to reform the [Creditor Trust A]greement.").  On appeal, DMA does not challenge the bankruptcy court's refusal to modify § 2.8.  Indeed, DMA concedes, as it did in below, 3 ER 370, that the Plan has been substantially consummated, and, therefore, cannot be modified under 11 U.S.C. § 1127(b).  AOB 24-25 & n.9.[11]  Instead, DMA argues that it seeks interpretation, not modification, and that the Creditor Trust Agreement should be reformed based on a purported mutual mistake.  AOB 23-24.  Both arguments lack merit.

### A.    The Relief DMA Seeks Is A Modification, Not An Interpretation

DMA's argument that the relief it seeks is "not modification but interpretation," AOB 24, is belied by DMA's briefs below, in which DMA expressly and repeatedly requested "modification" of the Creditor Trust Agreement.  *See* 3 ER 367 ("The Court should approve the following modification to paragraph 2.8(ii)(A) of the DMA Creditor Trust Agreement . . . ."); 3 ER 368 ("THE CREDITOR TRUST AGREEMENT SHOULD BE MODIFIED"); 3 ER 369 ("this provision [§ 2.8 of the Creditor Trust Agreement] should be modified"); 3 ER 374 (requesting that "[t]he Court approve the following modification to paragraph 2.8(ii)(A) of the DMA Creditor Trust Agreement . . . ."); 4 ER 567 ("Paragraph 2.8(ii)(A) of the Creditor Trust Agreement can and should be modified . . . ."); *id.* (requesting that "[t]he Court approve the following modification to paragraph 2.8(ii)(A) of the DMA Creditor Trust

---

[11] Below, DMA also argued that the Creditor Trust Agreement could be modified because it was not part of the Plan, 3 ER 370, but it now has abandoned that argument, AOB 21.

**BRIEF OF APPELLEE**

1   Agreement . . . .”); 4 ER 571 (“THE CREDITOR TRUST AGREEMENT SHOULD

2   BE MODIFIED”); 4 ER 574 (requesting that “[t]he Court approve the following

3   modification to paragraph 2.8(ii)(A) of the DMA Creditor Trust Agreement . . . .”).

4           In addition, DMA’s argument that it does not seek a modification of the

5   Plan also is incorrect.  The relief DMA seeks – application of the specific guideline in

6   Revenue Procedure 94-45 concerning the timing of approval of an extension of a trust

7   instead the language of § 2.8 of the Creditor Trust Agreement – could be achieved in

8   only one of two ways.  It could be achieved by (a) changing the language of § 2.8,

9   which is what DMA asked the bankruptcy court to do, or (b) eliminating the timing

10  requirement of § 2.8.  Both of those options would be *modifications* of the Plan.  *See*

11  *Black’s Law Dictionary* 1004 (6th ed. 1990) (“**Modification.**  A change; an alteration

12  or amendment which introduces new elements into the details, or cancels some of

13  them, . . . .”).  As explained *supra* at 11-12, 17-18, under California law a court

14  cannot, under the guise of *interpretation*, eliminate terms of an agreement or add

15  terms that conflict with existing terms of an agreement.  Nor under § 1127(b) can

16  “interpretation” be used to change the terms of a substantially consummated plan.

17          The district court’s decision in *Enterprise Financial Group, Inc. v. Curtis*

18  *Mathes Corp.*, 197 B.R. 40 (E.D. Tex. 1996), involved a similar situation.  There, the

19  liquidating trustee filed a motion to “[c]larify” the terms of the debtor’s confirmed

20  plan to allow the liquidating trust to pursue certain litigation and recover damages

21  incurred before the petition date, and the reorganized debtor to pursue other litigation

22  and recover damages incurred after the petition date.  *Id.* at 42-43.  The trustee sought

23  “clarification” of the plan because it was “undisputed” that the plan had been

24  substantially consummated.  *Id.* at 44.  The bankruptcy court granted “clarification”

25  over the objection of a single creditor that was alleged to have acquired its claims

26  against the debtor “in bad faith.”  *Id.*  at 43.  The district court reversed, stating:

27                  *Even if the proposed change does more accurately reflect*

28                  *the intent of the Plan*, the proposed change modifies a

---

20

**BRIEF OF APPELLEE**

*material term* of the Plan.  Under the Plan all claims against any third party were preserved and retained for the benefit of the [liquidating trust].  The Plan is *not silent* on this issue.  The language of the Plan is *clear and unambiguous*.  The proposed amendment to the Plan, however, now allows [the reorganized debtor] to pursue some of those claims which were expressly reserved for the [liquidating trust].  Under no circumstances can this be viewed as a mere clarification.

*Id.* at 45-47 (emphasis added); *see also In re Falcon Prods., Inc.*, No. 05-41108-399, 2007 Bankr. LEXIS 4655, at \*26 (Bankr. E.D. Mo. Oct. 9, 2007) ("No matter what label it places on its Motion nor what language it employs in describing the relief it seeks, the Trust is attempting to change the terms of a confirmed and substantially consummated Plan.  It simply cannot do so.").

Here, as in *Enterprise Financial Group*, the Plan is not silent on the required timing for approval of an extension of the term of the Creditor Trust.  Section 2.8 of the Creditor Trust Agreement expressly addresses that issue.  Moreover, the bankruptcy court found that the timing requirement of § 2.8 is material and unambiguous, *see supra* at 7-8, and DMA does not challenge either of those findings.  Thus, as in *Enterprise Financial Group*, the relief DMA seeks is a modification, not an interpretation or clarification, and, therefore, the bankruptcy court properly concluded that it was impermissible under § 1127(b).[12]

---

[12] DMA's cases concerning the issue of interpretation versus modification (AOB 24-25) are inapposite.  *See, e.g., Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*, 547 F.3d 763, 770-71 (7th Cir. 2008) (relief requested "did not rewrite the plan so that it would include a provision" contrary to a provision already in the plan); *Terex Corp.*, 984 F.2d at 173 (relief requested did not change or negate any provision of the plan); *Beal Bank v. Jack's Marine, Inc. (In re Beal Bank)*, 201 B.R. 376, 380 (E.D. Pa. 1996) (relief requested "did not alter any provision of the Plan," but "clarified the Plan on a matter on which it was silent").

21

**BRIEF OF APPELLEE**

1

**B.    DMA Failed To Satisfy Its Burden Of Proving A Mutual Mistake**

2      DMA argues here, as it did for the first time at the hearing on the

3  Extension Motion, that "reformation of the creditor trust agreement based on mutual

4  mistake was compelled."  AOB 23.  DMA is incorrect.  "As a general rule, a written

5  contract, having been deliberately executed, is presumed to correctly express the

6  parties' intentions."  *Appalachian Ins. Co.*, 214 Cal. App. 3d at 19.  However,

7  "[w]hen, through . . . a mutual mistake of the parties, or a mistake of one party, which

8  the other at the time knew or suspected, a written contract does not truly express the

9  intention of the parties, it may be revised, on the application of a party aggrieved, so

10  as to express that intention, . . . ."  Cal. Civ. Code § 3399.  DMA had the burden of

11  proving mutual mistake by clear and convincing evidence.  *See Hess v. Ford Motor*

12  *Co.*, 27 Cal. 4th 516, 525 (2002) ("party alleging mistake bears the burden of proof");

13  *Inamed Corp. v. Medmarc Cas. Ins. Co.*, 258 F. Supp. 2d 1117, 1123 (C.D. Cal. 2002)

14  ("'Reformation or revision on the ground of mutual mistake . . . requires clear and

15  convincing evidence of the alleged mistake.'  'Clear and convincing evidence requires

16  a finding of high probability … requiring that the evidence be so clear as to leave no

17  substantial doubt; sufficiently strong to command an unhesitating assent of every

18  reasonable mind.'") (citation omitted).  DMA did not satisfy its burden.

19      The Court of Appeal's decision in *Appalachian Insurance Company* is

20  instructive.  There, Appalachian argued that a contract between its insured (Western

21  Union) and McDonnell Douglas should be reformed based on a mutual mistake

22  because it did not reflect the "true intent of the parties," which was to adopt the exact

23  language of an inter-party waiver required by NASA.  *Appalachian Ins. Co.*, 214 Cal.

24  App. 3d at 18.  Appalachian provided evidence that the parties intended to comply

25  with the inter-party waiver language required by NASA, and that the inter-party

26  waiver in the contract between Western Union and McDonnell Douglas varied from

27  that language.  *Id.* at 20.  The court concluded that this evidence was "insufficient to

28  support reformation."  *Id.*  It found that the fact that the language in the contract

22

**BRIEF OF APPELLEE**

between Western Union and McDonnell Douglas was not exactly the same as the language required by NASA, without any evidence that the parties intended the language to be exactly the same, did not establish a mutual mistake. *Id.* at 20-21. In addition, it found that the Appalachian failed to "present[] evidence explaining how the mistake occurred." *Id.* at 21.

Here, DMA did not provide any evidence that all of the thousands of parties to the Plan intended that the language of the Creditor Trust Agreement would conform exactly to the language of Revenue Procedure 94-45 and, therefore, that the language of § 2.8 of the Creditor Trust Agreement was a mistake. As explained *supra* at 16-17, the unsworn assertions of outside counsel for DMA and the Trustee are not even evidence, let alone clear and convincing evidence of a mutual mistake by *all* of the parties to the Plan, including all of DMA's creditors. *See Bailard v. Marden*, 36 Cal. 2d 703, 708 (1951) (holding that courts cannot "'reform an instrument according to the terms in which one of the parties understood it, unless it appears that the other party also had the same understanding'") (citation omitted); *Perry v. Bedford*, 238 Cal. App. 2d 6, 11 (1965) ("A contract cannot be reformed solely because one of the parties made a mistake."). Moreover, DMA failed to provide any explanation for how the purported mistake occurred. Thus, like Appalachian, DMA failed to satisfy its burden of proving a mutual mistake.

DMA's reliance on *Hess* is misplaced. There, *all* of the parties to the agreement testified that it contained a mutual mistake, the evidence of mutual mistake was *uncontroverted*, and the evidence of the reason for the mistake was *uncontroverted*. *Hess*, 27 Cal. 4th at 521, 526-27. Here, none of those factors are present. *First*, DMA did not provide evidence that all of the thousands of parties to the Plan believed that the language of § 2.8 of the Creditor Trust Agreement was a mistake. *Second*, even if the unsworn assertions of counsel could somehow be construed as "evidence," that "evidence" of mistake was not uncontroverted. As the bankruptcy court found, the unambiguous terms of the Plan and § 2.8, and DMA's

23

**BRIEF OF APPELLEE**

conduct in seeking and obtaining the first extension of the term of the Creditor Trust in full compliance with § 2.8, show that there was no mistake.  *See Inamed Corp.*, 258 F. Supp. 2d at 1122 ("*Hess* is plainly distinguishable from the instant case, in which the extrinsic evidence is in conflict . . . .").  *Third*, DMA did not provide any excuse for the purported mistake.  *Appalachian Ins. Co.*, 214 Cal. App. 3d at 21.  Thus, the bankruptcy court properly concluded that § 2.8 did not contain a mutual mistake.

Further, even if DMA had established a mutual mistake by clear and convincing evidence, § 2.8 still could not be reformed based on such a mistake because it is part of a substantially consummated Plan that cannot be modified.  *See Enter. Fin. Group*, 197 B.R. at 45-47 (refusing to permit modification of the plan even if it would "more closely reflect the intent of the parties" because it would change a material provision of the plan); *cf. In re Logan Place Props., Ltd.*, 327 B.R. 811, 812 (Bankr. S.D. Tex. 2005) (denying request to modify plan's listing of value of estate's sole asset from $3.4 million to $4.4 million because "[t]he Trust cannot satisfy" § 1127, "and therefore cannot change the plan as it stands, regardless of whether mutual mistake existed").  DMA does not cite a single case allowing reformation of a material provision of a substantially consummated plan based on mutual mistake, and DWMC is aware of none.

**III.   DMA's Argument That DWMC Lacks Standing To Defend The Bankruptcy Court's May 17 Order On Appeal Has No Merit**

DMA argues that DWMC does not have prudential standing[13] because it is not a "person aggrieved."  AOB at 26-29.  DMA is wrong on the law and the facts.

**A.   The "Person Aggrieved" Test Does Not Apply To Appellees**

The Ninth Circuit has adopted the "person aggrieved" test for prudential standing in bankruptcy appeals.  *See Fondiller v. Robertson (In re Fondiller)*, 707 F.2d 441, 442-43 (9th Cir. 1983).  Under that test, "[o]nly those persons who are

---

[13] DMA does not, and could not, argue that DWMC lacks constitutional standing.  Nor does DMA challenge the bankruptcy court's ruling that DWMC is a "party in interest" with standing under 11 U.S.C. § 1109(b).  1 ER 14; 2 ER 155-56, 200, 312-13.

24

**BRIEF OF APPELLEE**

1   directly and adversely affected pecuniarily by an order of the bankruptcy court  have .

2   . . standing *to appeal* that order."  *Id.* at 442 (emphasis added).

3              Thus, by its terms, the "person aggrieved" test applies only to appellants,

4   not to appellees like DWMC.  *See*, *e.g.*, *Baron & Budd, P.C. v. Unsecured Asbestos*

5   *Claimants Comm.*, 321 B.R. 147, 160 n.4 (D.N.J. 2005) ("The 'persons aggrieved'

6   standard does not apply to parties such as Appellee Insurers, who seek to defend a

7   favorable ruling on appeal--these parties need not meet standing requirements."); 8B

8   C.J.S. *Bankruptcy* § 1239 (2011) ("The 'persons aggrieved' standard for bankruptcy

9   appellate standing does not apply to parties who seek to defend a favorable

10  bankruptcy court ruling on appeal; these parties need not meet the standing

11  requirements."); *see also Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair,*

12  *Inc. (In re Trailer Source, Inc.)*, 555 F.3d 231, 237 (6th Cir. 2009) ("[T]he district

13  court may hear an initial appeal only from a sufficiently 'aggrieved party' whose

14  interests are directly implicated in the bankruptcy proceedings.  Aligned on the other

15  side in the district court are adverse parties who, though they may not independently

16  meet the requirements of appellate standing, have a concrete stake in the outcome at

17  least sufficient to establish an Article III 'case' or 'controversy.'").  Further, the

18  "person aggrieved" test "derives from section 39c of the Bankruptcy Act of 1898,"

19  *Fondiller*, 707 F.2d at 442-43, which provided that:  "A person aggrieved by an order

20  of a referee may . . . file with the referee a petition for review of such order by a judge

21  . . . .  Unless the person aggrieved shall petition for review . . . , the order of the

22  referee shall become final. . . ."  11 U.S.C. § 67(c) (1976) (repealed 1978).  Thus, by

23  its terms, Section 39(c) applied only to appellants.  The Ninth Circuit recognized that

24  fact in its statement of the test:  "To have standing to bring this appeal, *appellant* must

25  demonstrate that she was directly and adversely affected pecuniarily by the order of

26  the bankruptcy court."  *Fondiller*, 707 F.2d at 443 (emphasis added).

27              It would make no sense to apply the "person aggrieved" standard to an

28  appellee like DWMC.  An appellee, by definition, *supports* the order on appeal, and

therefore will not be "directly and adversely affected pecuniarily by" that order.  If an appellee were also a cross-appellant, it would have to satisfy the "person aggrieved" test as to the issues on which it appeals.  However, there is no cross-appeal here.  Moreover, a bankruptcy court cannot defend its own order on appeal, so that must be done by someone else.  *See, e.g.*, *Heath v. Am. Express Travel Related Servs. Co. (In re Heath)*, 331 B.R. 424, 429 (B.A.P. 9th Cir. 2005) (allowing chapter 7 trustee to participate in appeal as appellee even though it had not participated below in part because "[t]he bankruptcy court cannot appear before us to defend its own ruling" and "[m]ost creditors cannot be expected to participate extensively in [bankruptcy] cases with few assets because the cost of doing so would likely outweigh the projected financial returns").  The obvious party to defend a bankruptcy court's order is the party that appeared in the bankruptcy court, had standing to do so, and prevailed.  Here, that party is DWMC.

The only case DMA cites where a court applied the "person aggrieved" test to an appellee is *Int'l Ass'n of Firefighters v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 288 n.13, 298-99 (B.A.P. 9th Cir. 2009).  AOB at 26.[14] *Vallejo* is not binding on this Court.  *See, e.g.*, *Bank of Maui v. Estate Analysis, Inc.*, 904 F.2d 470, 472 (9th Cir. 1990) ("[I]t must be conceded that BAP decisions cannot bind the district courts themselves.  As article III courts, the district courts must always be free to decline to follow BAP decisions and to formulate their own rules within their jurisdiction.").  Nor is *Vallejo* persuasive authority on this point, as the Bankruptcy Appellate Panel cited no authority and provided no rationale for its application of the "person aggrieved" test to appellees.  *Vallejo*, 408 B.R. at 299.  Further, the situation in *Vallejo* was very different from the situation here.  There, the City of Vallejo – which had opposed an objection in the bankruptcy court and prevailed – was already the primary appellee.  *Id.* at 285-88.  Thus, the participation as

---

[14] None of the other cases DMA cites for the proposition that "the *appellee* must have standing as well," AOB at 26, even remotely supports the proposition that an appellee with respect to a bankruptcy court order must satisfy the person aggrieved test.

**BRIEF OF APPELLEE**

additional appellees of certain banks, which had not even filed substantive pleadings before the bankruptcy court on the matter at issue, was not necessary for the court's order to be adequately defended on appeal.  Here, DWMC was the only party to oppose the Extension Motion below, it prevailed, and it is the only appellee.

Thus, the "person aggrieved" test does not apply to an appellee like DWMC, and DMA's standing argument should be rejected on that basis alone.

### B. Even If The "Person Aggrieved" Test Applies To Appellees, DWMC Satisfies It

In the event that this Court were somehow to conclude that the "person aggrieved" test applies to appellees, DWMC satisfies the test.  As DMA concedes, AOB 27-28, under the "person aggrieved" test, a creditor has standing to appeal an order concerning the disposition of assets in a limited fund from which the creditor seeks to be paid.  *See Salomon v. Logan (In re Int'l Envtl. Dynamics, Inc.)*, 718 F.2d 322, 326 (9th Cir. 1983) ("in a case involving competing claims to a limited fund, a claimant has standing to appeal an order disposing of assets from which the claimant seeks to be paid"); *Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.)*, 177 F.3d 774, 777-78 (9th Cir. 1999) (holding that a creditor was a "person aggrieved" because it had "a direct pecuniary interest in a bankruptcy court's order transferring assets of the estate");[15] *Brady v. Andrew (In re Commercial W. Fin. Corp.)*, 761 F.2d 1329, 1335 (9th Cir. 1985) ("investors plainly meet the *Fondiller* test . . . because . . . [t]he plan eliminated their interests in the borrower notes and deeds of trust and disposed of the assets in the estate from which they seek to be paid"); *Vallejo*, 408 B.R. at 299 ("Courts have granted creditors standing to appeal orders that result in the transfer of assets of the estate or competing claims to a limited fund, reasoning that such orders directly and adversely pecuniarily affect them.").

---

[15] DMA argues that *P.R.T.C.* is inapplicable because "reversal of the bankruptcy court's order denying the motion to extend the term of the trust would not result in any transfer of assets," but would merely "fund the adversary proceeding against DWMC."  AOB at 27-28.  That is a *non sequitur*.  "[F]und[ing] the adversary proceeding" is a transfer of assets, *i.e.*, the funds in the Creditor Trust, to DMA's lawyers.  Thus, *P.R.T.C.* is directly on point and supports DWMC's standing.

**BRIEF OF APPELLEE**

The May 17 Order involved the disposition of assets in a limited – and dwindling – fund (cash in the Creditor Trust) to which there are competing claims (that of DMA to pay its attorneys and those of DMA's creditors). *See supra* at 5-6. Based on the bankruptcy court's judgment in the Adversary Proceeding, DWMC has by far the largest creditor claim to that fund. *Id.* The May 17 Order determined how the funds can be used after June 30, 2011. DMA appealed because it wants the Trustee to use the funds in the Creditor Trust to pay DMA's litigation expenses. AOB 2. DWMC supports the May 17 Order because it wants the funds to be used to pay DMA's creditors, including DWMC. Thus, DWMC's interest in defending the May 17 Order is pecuniary, and it will be directly and adversely affected if the Order is reversed and the cash in the Creditor Trust is used for purposes other than paying DMA's creditors. DMA and the Trustee conceded as much by filing Certificates of Interested Parties in this appeal, listing DWMC as a "party . . . [that] may have a pecuniary interest in the outcome of this case." 1 SER 31, 33. Therefore, even if the "person aggrieved" test applies to appellees (and it does not), DWMC satisfies it.

Citing *Moran v. LTV Steel Co. (In re LTV Steel Co.)*, 560 F.3d 449, 452-56 (6th Cir. 2009), DMA argues that because DWMC is not only a creditor, but also a defendant in the Adversary Proceeding, it is not a "person aggrieved." *See* AOB at 28. *LTV* is inapposite for several reasons.

*First*, like all of DMA's cases other than *Vallejo*, it involved the standing of an appellant, not an appellee like DWMC. *LTV*, 560 F.3d at 451-56. *Second*, *LTV* conflicts with binding Ninth Circuit precedent. *See P.R.T.C.*, 177 F.3d at 777-78 (holding that appellant would not have standing in its capacity as a defendant, but nonetheless had standing as a creditor to appeal an order authorizing the disposition of assets that would otherwise be used to pay creditors).[16] DWMC is not aware of

---

[16] DMA cites the dissenting opinion in *Hyundai* because it says the judges in *LTV* agreed with it. AOB 27 n.10. However, the dissent in *Hyundai* specifically accepted the Ninth's Circuit's holding in *P.R.T.C.* that a party's standing as a creditor must be analyzed separately from its status as a defendant. *See Hyundai*, 555 F.3d at 249. It then distinguished *P.R.T.C.* because the creditor/defendant in *P.R.T.C.* – like DWMC

28

**BRIEF OF APPELLEE**

1  another case in which a court has adopted the approach of the court in *LTV*, denying a

2  creditor prudential standing because it also had some other interest with respect to the

3  order on appeal.  For example, in *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*,

4  126 F.3d 380 (2d Cir. 1997), two creditors appealed an order authorizing sale of the

5  debtor's assets.  Appellees argued that the creditors were not "persons aggrieved"

6  because they were "appealing as disappointed bidders, not as creditors."  *Id.* at 388.

7  As evidence of their "improper motives," appellees argued – as DMA argues here –

8  that "none of the other unsecured creditors oppose the sale."  *Id.*  The Second Circuit

9  disagreed, holding that even if the creditors lacked standing as unsuccessful bidders,

10  they nonetheless had standing as creditors because they claimed that the purchaser's

11  conduct "diminished the value of the estate's assets, thereby limiting their recovery as

12  creditors."  *Id.*  The Second Circuit also explained that:

13  > The other unsecured creditors' support for the sale order

14  > does not refute [appellants'] status as creditors.  Nor is our

15  > decision swayed by the fact that these two appellants are

16  > motivated, at least in part, by the hope that they may

17  > purchase the estate's assets at a resale.

18  *Id.*  Here, as in *Gucci*, DWMC's status as a creditor gives it prudential standing with

19  respect to the May 17 Order, and the fact that DMA's other creditors did not

20  participate below or are not participating in this appeal is irrelevant.  *Cf. Enter. Fin.*

21  *Group*, 197 B.R. at 43 (reversing bankruptcy court's modification of substantially

22  consummated plan where only one creditor objected below and appealed).

23  > *Third*, the situation in *LTV* differs significantly from this appeal.  In *LTV*,

24  the only claim of the creditor/defendant/appellant (Moran) against LTV was a claim

25  _____

26  here, and unlike the creditor in *Trailer Source* – would suffer direct pecuniary harm
because assets that would be used to pay its claim would be transferred from the
estate.  *See id.* at 252  As the dissent stated: "Generally, a creditor must show than an

27  order immediately and concretely injures him, by, for example, reducing the amount
of assets available for the payment of his specific claims or eliminating his specific

28  interest in the estate."  *Id.* at 253 (citations omitted).  As demonstrated above,
assuming that test applies to an appellee (which it does not), DWMC satisfies it.

29

**BRIEF OF APPELLEE**

1 for indemnification with respect to the very lawsuit against him that the order on

2 appeal authorized. *LTV*, 560 F.3d at 454-55. This circumstance was critical to the

3 court. *Id.* For example, the court stated that: "Moran's status as a[] . . . claimant is

4 solely dependant on the existence of the . . . Order that he now seeks to challenge."

5 *Id.* at 454. Thus, the court concluded, Moran's argument that he had prudential

6 standing because he had a claim for indemnification was simply a recast of his losing

7 argument that his status as a defendant gave him standing. *See id.* at 455 ("This is

8 nothing more than an indirect way of arguing that his status as a defendant in a lawsuit

9 is sufficient to confer 'person aggrieved' standing."). Here, by contrast, DWMC's

10 claim against DMA does not arise out of the May 17 Order. Its claim is for money

11 owed by DMA for vehicles and parts DWMC delivered to DMA prepetition. Thus,

12 unlike that of Moran, DWMC's status as a creditor is completely independent of the

13 order on appeal. Therefore, even if *LTV* were good law, it does not apply here.

## CONCLUSION

15 For the foregoing reasons, the May 17 Order should be affirmed.

16 Dated: July 11, 2011                    SIDLEY AUSTIN LLP

18                                         /s/  Joshua E. Anderson
19                                         Joshua E. Anderson
                                          Attorney for Appellee
20                                         Daewoo Motor Company, Ltd.

**BRIEF OF APPELLEE**

LA1 2146627v.4